**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

THRACY R. PARKS, JR., #403647
    Petitioner                                 :

    v.                                           :   CIVIL ACTION NO. ELH-14-1279

DAYENA CORCORAN, Warden, et al.     :
    Respondents

**<u>MEMORANDUM</u>**

Thracy R. Parks, Jr., a self-represented Maryland prisoner, seeks habeas corpus relief pursuant to 28 U.S.C. § 2254. ECF 1. He attacks his 2012 convictions in the Circuit Court for Prince George's County for two counts of attempted first-degree murder and other offenses. ECF 1. He also submitted exhibits in support of the petition.[1] The Warden of the Maryland Correctional Institution and the Maryland Attorney General (collectively, the "State") have responded. *See* ECF 3; ECF 7. They also submitted many exhibits. Parks has not replied.[2] For the reasons set forth below, the petition shall be denied and a certificate of appealability shall not issue.[3]

**I. Factual and Procedural History**

A. State Proceedings

---

[1] The exhibits (A through L) were filed separately, and do not appear on the electronic docket.

[2] Although Parks did not submit a reply, in December 2015 he twice inquired as to the status of his case. *See* ECF 8; ECF 9.

[3] This case was initially assigned to the Honorable William D. Quarles, Jr. It was reassigned to me on January 27, 2016, due to Judge Quarles's retirement.

Parks was charged in the Circuit Court for Prince George's County with two counts of attempted first-degree murder and related offenses. On February 9, 2012, a jury convicted him of two counts of attempted first-degree murder, four counts of attempted second-degree murder, five counts of first-degree assault, reckless endangerment, and two handgun offenses. On April 13, 2012, he was sentenced to life imprisonment, with all but 45 years suspended. ECF 1; ECF 3-1 through 3-4.[4]

On direct appeal, the Maryland Court of Special Appeals affirmed the convictions in an unreported opinion issued on May 16, 2013. *See* ECF 3-4, *Parks v. State of Maryland*, No. 721, Sept. Term 2012 (filed May 16, 2013). Of import here, the Court of Special Appeals set forth the questions that Parks presented on direct appeal, as follows, ECF 3-2 at 2:

1. Did the lower court err in denying Thracey['s] Motion to Suppress the fruit of a warrantless search of a garage used by Thracy to store his vehicles, based on the conclusions that: (1) Thracy lacked standing to challenge the warrantless search of a parking garage he rented from a friend, and possessed the only key to; and (2) the friend had validly consented to the search of the garage?

2. Where both parties examined a witness as to the fact that she exchanged text messages with Thracy, but neither party inquired about or established the content of those messages in direct or cross-examination, did the court erroneously permit the State to exceed the scope of redirect examination when it permitted the State to establish the content of the text messages in redirect examination?

Notably, the Court of Special Appeals summarized at length the facts of the case, as follows, *id.* at 3-10:

**Facts and Procedural History**

**I.    Shooting Incidents and Investigation**

---

[4] This opinion references the pagination as it appears through this court's electronic docketing system.

On October 30, 2010, a dispute arose between Thracy[5] and his former spouse, Rhonda Parks ("Rhonda"), concerning a jointly owned, tenanted property. The dispute escalated into a physical confrontation during which Thracy wielded a knife and bat, attempted to drive off with Rhonda's vehicle, and stated that he was "going to have to shoot somebody out here tonight." According to Rhonda, approximately five to ten minutes after this altercation, Thracy initiated an exchange of approximately ten text messages "along the same lines as the verbal threat." On redirect examination at trial, Rhonda revealed the contents of the text messages:

[STATE]: What did [the text messages] say?

[RHONDA]: [Thracy] told me to-that he hoped my father rests in peace from that day forward when he went to bed at night.

[STATE]: Anything else?

[RHONDA]: [Thracy] told me, fuck me. Fuck my dad. [Thracy] told me that.
[STATE]: Was that the gist of the text messages, what you just told me?

[RHONDA]: Yes.

In the early hours of November 4, 2010, five days after the dispute, Rhonda was rousted from her sleep by the sound of gunfire. Rhonda, the couple's five-year-old son Thracy III, and the homeowners, Henry and Rhoda Gabriel (Rhonda's parents), were at the residence when the shooting started. Shortly thereafter, a similar incident occurred at the home of Marcus Gabriel, Rhonda's brother.

Detectives Melvin Kenney and Joseph Bellino of the Prince George's County Police Department were summoned to conduct the investigation. In the early stages of the investigation, the detectives determined that Thracy met with a friend, Tamara Marsh, that morning. According to Marsh, Thracy contacted her by text message at approximately 3:30 a.m. on November 4, 2010, estimated by the State to be thirty minutes after the shootings. One text message from Thracy stated, "I would probably need the parking space." Thracy and Marsh met at Marsh's apartment complex and had a conversation in Marsh's vehicle for an unspecified time.

The parking space in the text message referenced a detached garage that Marsh rented at her apartment complex. Marsh entered into a rental

---

[5] The Court of Special Appeals explained that because the defendant's former spouse, Rhonda Parks, has the same last name as the defendant, it would refer to these individuals by their first names, to avoid confusion. *See* ECF 3-4 at 2 n.1.

agreement with her landlord, paying $100.00 per month to receive access to the detached garage. Thracy advanced the rental fee to Marsh and, in exchange, was permitted to use the garage unit to park a vehicle and store items. Although Marsh was the named lessee, Marsh reportedly never used or entered the unit, and Thracy retained the only key to access the unit.

At some point after Thracy and Marsh's meeting concluded, Thracy called Marsh to report that he was detained by police. Thereafter, Marsh appeared at a Prince George's County Police Department station at or about 5:15 a.m. to inquire as to Thracy's status and was interviewed by Det. Bellino. During the course of Marsh's interview, consent was obtained to search the detached garage unit.

A search of the garage unit revealed a Lexus, owned by Thracy, as well as an assortment of boxes. Upon entering the unit, Det. Kenney identified the butt of a handgun and holster in a box. Police impounded the Lexus and recovered shell casings from the vehicle during the inventory search.

## II. Suppression Hearing

At the hearing on the motion to suppress, two conflicting accounts of the interview and warrantless search emerged.

### A. Detectives' Testimony

As presented by Det. Bellino, Marsh was "very cooperative," provided a written statement, and answered questions. During the interview, Marsh inquired about Thracy, informing Det. Bellino that the two met earlier that morning, and then stated her intent to terminate the interview if Det. Bellino did not provide an answer as to why Thracy was detained.

Det. Bellino responded that Marsh was "free to leave," but that he needed to retain her car keys and cell phone while a search warrant was obtained because Thracy "could have possibly secreted an item inside her vehicle." As Marsh continued to press Det. Bellino for information, Det. Bellino agreed to tell Marsh the basis for Thracy's detention if "she would listen."

Marsh agreed to continue the interview and was told about the shooting incidents. According to Det. Bellino, Marsh's demeanor changed at this point of the interview, however, Marsh did sign a "consent to search form" for her vehicle and permitted photographs to be taken of the text messages on her phone sent by Thracy earlier that morning.

4

The search of Marsh's vehicle proved unproductive. At 7:07 a.m. Det. Bellino requested and obtained Marsh's consent to search her apartment. Det. Bellino stated that he returned Marsh's car keys and cell phone and allowed her to use the restroom and make arrangements to transport her children to school. At approximately 8:00 a.m., Marsh accepted Det. Bellino's invitation to allow him to drive her to her apartment. While en route, Marsh "realized she needed the key to her garage" which prompted Det. Bellino to return to the police station in order to retrieve the key from Thracy's property.

Upon arrival at Marsh's apartment, Det. Bellino requested and obtained written consent to search the detached garage. According to Det. Bellino and Det. Kenney, during the search of her apartment, Marsh appeared to be "cooperative," "calm," "relaxed," and "joked with the detectives."

**B.     Marsh's Testimony**

Marsh's recollection of the interview and search process diverged significantly from the detectives's testimony. According to Marsh, Det. Bellino "yelled at her," confiscated her cell phone and car keys, and informed Marsh that she would have to remain at the police station until search warrants were obtained.

Marsh acknowledged that she signed the "consent to search form" for her vehicle, however, she claimed she "did not really consent" "because Detective Bellino stated she was an accessory to murder, and that she would be charged with serious charges."

When Marsh's vehicle was searched, Marsh reported that she was left in an interview room for approximately twenty to thirty minutes. According to Marsh, during this period, an unidentified detective entered the interview room and "told [Marsh] she was facing serious charges and should do what Detective Bellino told her to do." When Det. Bellino returned to the interview room and requested consent to search Marsh's apartment, Marsh "felt forced and felt that she had no other choice." Further, Marsh testified that she was not permitted to make a phone call or use the restroom, and she signed the consent form to get home in order to send her children off to school.

Contrary to Det. Bellino's testimony, Marsh testified that she was not permitted to drive herself to her apartment and had to request permission to use her own restroom upon arrival. During the search of Marsh's apartment, Marsh agreed to a search of the detached garage, feeling "compelled to consent to further searches because the officers kept threatening to charge her."

5

## C. Circuit Court's Ruling

Thracy sought to exclude the evidence obtained during the warrantless search of Marsh's detached garage on the theory that Marsh was subjected to a "protracted interrogation," was not free to leave, and was threatened to be arrested as an accessory to attempted murder. Further, Thracy maintained that his exclusive use of the garage provided standing to challenge the warrantless search.

In response, the State argued that Thracy had no legitimate privacy interest in the garage, and that the court should give more weight to the testimony of Detectives Bellino and Kenney in determining whether consent was voluntarily obtained. A grant of the motion to suppress stood to exclude highly inculpatory forensic evidence.[FN]

---

[FN] The importance of this evidence came to the forefront at trial through the testimony of the State's DNA analyst. DNA extracted from the grip of the handgun recovered by Det. Kenney was "consistent" with Thracy's DNA. Further, "the likelihood that an individual in the African American population would share the same profile [as Thracy] was one in 218 trillion." Ballistics testing revealed that expended shells recovered from the scenes of booth shootings were fired from the handgun containing Thracy's DNA recovered in Marsh's garage.

---

In addressing the motion, the circuit court engaged in a multifactor analysis which examined: Thracy's possessory interest in the garage, Thracy's right to and duration of stay in the garage, limitations on Thracy's access to the area, Thracy's right to exclude others from the area, the precautions Thracy took to ensure privacy, Thracy's subjective expectation of privacy, the location of the seized property at the time of the search, and Thracy's ownership interest in the property seized.

The circuit court found "instructive" that: Thracy did not have an actual lease to the detached garage unit, Marsh referred to the unit as "my garage," the lease agreement was "not a more permanent relationship as [Thracy] would like the Court to believe" and, more saliently, the text message sent to Marsh allowed for the inference that Thracy needed advanced permission to use the garage unit. Further, the circuit court found that because Thracy did not testify, the court was without a basis to ascertain whether Thracy manifested a subjective expectation of privacy in the garage. Taken together, the circuit court concluded that Thracy lacked standing to challenge the search.

Although the court disposed of the motion to suppress by concluding that Thracy lacked standing, the circuit court entered a specific

6

finding which addressed Thracy's claim that Marsh's consent was not voluntarily obtained. The circuit court found that "the testimony of Ms. Marsh lacked credibility in many areas" and "the officers' version of how the consents came to be about to be credible." In light of the events as recalled by the detectives and Thracy's lack of an "ownership interest in either the apartment or the garage," the circuit court found that Marsh had authority to provide consent and such consent was voluntary.

### III. Trial Proceedings

Rhonda testified as to the sequence of events which precipitated the shootings. When asked on direct examination to divulge the content of text messages received from Thracy on October 30, 2010, the circuit court disallowed a response pursuant to Thracy's objection. On cross-examination, Thracy asked about the substance of Rhonda's written statement to detectives on November 4, 2010, with emphasis on a notation written in the margin of the page submitted to the detectives. There were no questions about the content of the text messages exchanged between Rhonda and Thracy.

On redirect examination, the State responded to Thracy's counsel's line of questioning by asking whether Rhonda, in providing her witness statement, informed the detectives of the text messages she received from Thracy. Thracy objected to the question and argued that the State exceeded the scope of cross-examination. The objection was overruled. The redirect examination continued:

[STATE]: Ms. Parks, did you tell, at the time, Detective Sinibaldi about some text messages you received?

[RHONDA]: I wrote them.

[STATE]: You wrote those text messages?

[RHONDA]: Yes.

\* \* \*

[STATE]: What did you write in your statements about the text messages you received?

Again, Thracy objected, challenging the scope of the questioning on the basis that the cross-examination did not address the text messages. The circuit court ruled that Thracy's cross-examination of Rhonda established a proper predicate to permit the State to introduce the contents of the text messages. However, the circuit court required that Rhonda demonstrate

knowledge that the number from which she received the text messages in question was associated with Thracy. Following this proffer, Rhonda disclosed the contents of the text messages.[]

As noted, the Maryland Court of Special Appeals affirmed the judgments of conviction. ECF 3-4. Thereafter, Parks filed a petition for a writ of certiorari to the Maryland Court of Appeals. ECF 3-5 at 1. As his petition for certiorari reflects, Thracy raised the same challenge to the search that he had raised in his direct appeal. *See* ECF 3-5 at 2. The Maryland Court of Appeals denied certiorari on September 23, 2013. ECF 3-5 at 13. Then, on March 3, 2014, the United States Supreme Court denied Parks's request for further review. *See Parks v. Maryland,* 134 S.Ct. 1498 (2014).

Parks instituted State post-conviction proceedings on January 3, 2014, raising an array of claims. ECF 3-1; ECF 3-6. These included claims that the trial court erred in denying his motion to suppress and that trial counsel was ineffective for failing to litigate effectively the motion to suppress. ECF 3-6. Post-conviction proceedings remain pending in State court. ECF 3-1.[6]

B. Federal Proceedings

In his petition, Parks asserts that the Circuit Court for Prince George's County erred in denying his motion to suppress the fruit of a warrantless search of a garage used exclusively to store Parks's personal property, based on its conclusions that (a) Parks lacked standing to challenge the warrantless search of the garage he rented from a friend "and possessed the only key to;" and (b) a third party had validly consented to the search of the garage. ECF 1 at 13. These assertions were fully raised and litigated in the state courts at trial and on appeal. Parks

---

[6] *See State v. Parks,* Case No. CT1100071X, http://casesearch.courts.state.md.us/casesearch/inquiryDetail.jis

also claims that trial counsel did not present proper argument at the suppression hearing and, in other, unidentified ways failed to act, causing cumulative prejudice to his defense. ECF 1 at 18-19 and 36-37.  Although the ineffective assistance claims may be raised in a post-conviction proceeding, they had not yet been reviewed in the Maryland courts.

In an initial, limited response (ECF 3), the State asserted that Parks's petition should be dismissed in its entirety, because Parks had not exhausted his claim regarding ineffective assistance of counsel. *Id.*  Several exhibits were submitted by the State with its response.  Judge Quarles reviewed the exhaustion requirement in his Order of September 18, 2014. *See* ECF 4.  He also found that Parks had not exhausted his State remedies as to the ineffective assistance of counsel claim. *Id.* at 3.  Parks subsequently agreed to waive all unexhausted claims.  ECF 5.[7]

The State then submitted a substantive response to the claims regarding the search of the garage.  ECF 7.  The response is supported by exhibits.  The State argues that Parks's claims are not cognizable, pursuant to the Supreme Court's ruling in *Stone v. Powell*, 428 U.S. 465 (1976), and its progeny.

The State's exhibits to ECF 3 and ECF 7 include, *inter alia*, Parks's appellate brief in the Court of Special Appeals and the transcripts from the suppression hearing held in the Circuit Court for Prince George's County on November 4 and November 8, 2011.  Those proceedings pertained to Parks's motion to suppress evidence obtained from the search of the garage.  *See* ECF 3-4; ECF 7-1; ECF 7-2; ECF 7-3.

---

[7] In ECF 4, Parks was apprised of the possible consequences of the waiver of his claim as to ineffective assistance. *Id.* at 4.

## II. Discussion

### A. Applicable Statutory Standards

Parks's claims must be analyzed under the statutory framework of the federal habeas statute at 28 U.S.C. § 2254. A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: "1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or 2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The statute sets forth a "highly deferential standard for evaluating state-court rulings." *Lindh v. Murphy*, 521 U.S. 320, 333 n. 7(1997); *see also Bell v. Cone*, 543 U.S. 447, 455 (2005). The standard requires courts to give state-court decisions "'the benefit of the doubt'" and is "'difficult to meet.'" *Cullen v. Pinholster*, 563 U.S. 179, 180 (2011) (citations omitted); *see also White v. Woodhall,* ____ U.S. ____, 134 S. Ct. 1697, 1699 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.")). Moreover, the petitioner "carries the burden of proof." *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam).

A state adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state court 1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or 2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v.*

*Taylor*, 529 U.S. 362, 405 (2000). Under the "unreasonable application" analysis pursuant to § 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 88 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "'[A] federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Williams*, 529 U.S. at 411). "Rather, that application must be 'objectively unreasonable.'" *Renico*, 559 U.S. at 773 (quoting *Williams*, 529 U.S. at 409). Thus, "'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Harrington*, 562 U.S. at 101 (quoting *Williams*, 529 U.S. at 410).

Further, under § 2254(d)(2) "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if '[r]easonable minds reviewing the record might disagree about the finding in question,'" a federal habeas court may not conclude that the state court decision was based on an unreasonable determination of the facts. *Id*. (citation omitted).

The habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e) (1). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where

state courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id*. at 379 (quoting 28 U .S.C. § 2254(e)(1)).

The Fourth Circuit recently summarized the applicable principles in *Grueninger v. Director, Virginia Dep't of Corrections*, ____ F. 3d ____, No. 14-7072 (filed Feb. 9, 2016).  It said, slip op. at 10-11:

> Under 28 U.S.C. § 2254(d), "the availability of federal habeas relief is limited with respect to claims previously 'adjudicated on the merits' in state court proceedings." *Harrington v. Richter*, 562 U.S. 86, 92 (2011). A federal habeas court may not grant relief on such claims unless it concludes that the State court's merits determination "was contrary to, or involved an unreasonable application of, clearly established Federal law" as set forth by the Supreme Court, 28 U.S.C. § 2254(d)(1), or rested on "an unreasonable determination of the facts" in light of the evidentiary record before the state court, *id.* § 2254(d)(2). And a state court's factual findings must be presumed correct, absent rebuttal by the petitioner by clear and convincing evidence. *Id.* §2254(e).
>
> As the Supreme Court has made clear, § 2254(d) permits federal habeas relief where a state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts" of the prisoner's case. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)).  But that is a high threshold, and only an "objectively unreasonable" determination by a state court will warrant federal habeas relief. *Id.*at 520-21; *see also Tice v. Johnson*, 647 F.3d 87, 108 (4th Cir. 2011).

### B.  Analysis

Parks's claims center on the constitutionality of the search of the garage, and are therefore premised on alleged violations of the Fourth Amendment. The law concerning Fourth Amendment claims in federal habeas corpus proceedings is well established.  The Supreme Court has held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.[]" *Stone v. Powell*, 428 U. S. 465, 482 (1976); *see also id.* at

494 (reiterating that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim,[] a state prisoner may not be granted federal habeas corpus relief on the ground that the evidence obtained in an unconstitutional search or seizure was introduced at his trial").

> [A] district court, when faced with allegations presenting Fourth Amendment claims, should, under the rule in *Stone v. Powell, supra*, first inquire as to whether or not the petitioner was afforded an opportunity to raise his Fourth Amendment claims under the then existing state practice. This may be determined, at least in this Circuit, from the relevant state statutes, the applicable state court decisions, and from judicial notice of state practice by the district court.
>
> Second, . . . when the district court has made the "'opportunity" inquiry, it need not inquire further into the merits of the petitioner's case, when applying *Stone v. Powell, supra*, unless the prisoner alleges something to indicate that his opportunity for a full and fair litigation of his Fourth Amendment claim or claims was in some way impaired.

*Doleman v. Muncy*, 579 F.2d 1258, 1265 (4th Cir. 1978); *see also Mueller v. Angelone*, 181 F.3d 557, 570 n.8 (4th Cir. 1999) (recognizing continued application of *Stone* post-AEDPA), *cert. denied,* 527 U.S. 1065 (1999); *Grimsley v. Dodson*, 696 F.2d 303, 304 (4th Cir. 1982) ("*Stone v. Powell* marked, for most practical purposes, the end of federal court reconsideration of Fourth Amendment claims by way of habeas corpus petitions where the petitioner has the opportunity to litigate those claims in state court.").

The record shows that Parks was provided with the opportunity to fully litigate his Fourth Amendment claims, challenging the validity of the search and seizure. Through counsel, he filed a motion to suppress in the trial court. Testimony was taken during an evidentiary hearing held on November 4, 2011 (ECF 7-1; ECF 7-2), at which the defense expressly challenged the search of the garage. *See*, *e.g.*, ECF 7-1 at 5-7. The trial judge ruled orally a few days later, and denied the motion to suppress. *See* ECF 7-3. After Parks was convicted, he again raised the issue in his direct appeal. The Maryland Court of Special Appeals thoroughly examined the facts

surrounding the seizure of the evidence as well as the legal reasoning of the circuit court, and upheld the trial court's denial of the motion to suppress. The Maryland Court of Appeals and the Supreme Court denied certiorari.

Clearly, Parks had a full and fair opportunity to litigate the legality of the search in the Maryland courts. Thus, his Fourth Amendment claim provides no basis for federal habeas corpus relief.

## Conclusion

The instant petition for habeas corpus relief will be denied and this case dismissed by separate Order. When a district court dismisses a habeas petition, a certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A prisoner satisfies this standard by demonstrating "'that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong'" *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-el v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)). Parks does not satisfy this standard. Therefore, the court declines to issue a certificate of appealability.

Date: February 10, 2016                    _____/s/_____
                                           Ellen L. Hollander
                                           United States District Judge